UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

KEVIN SHEILS,

                                            Plaintiff,

            vs.

                                                                    9:04-CV-861
R. ROCK; K. MATOTT; C.O. MASON;                                     (J. Kahn)
C.H.O. DROWN

                                            Defendants.

_____

KEVIN SHEILS, Plaintiff *Pro Se*
DAVID FRUCHTER, Assistant Attorney General

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

        In this civil rights complaint, plaintiff alleges that defendants retaliated against

him for filing "administrative complaints;" that defendants were deliberately

indifferent to plaintiff's serious medical needs; that defendants used excessive force

against plaintiff and thereafter denied him medical care subsequent to the alleged

assault. Complaint (Compl.) ¶ 2 (Dkt. No. 1).  Plaintiff seeks declaratory and

substantial monetary relief.[1]

_____

        [1]Plaintiff has filed at least two other cases in the Northern District of New York.  *Sheils v.
Lt. Byno*, 9:02-CV-1252; *Sheils v. Brannen*, 9:05-CV-135.  *Shiels v. Brannen* appears to relate to
an alleged assault of plaintiff mentioned in this complaint. Compl. ¶¶ 39-40.  Although plaintiff
mentions the alleged assault in this complaint, he ***does not name any defendants who would
have been responsible for the incident***.  In 9:05-CV-135, there are six defendants named, and

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 64). Plaintiff was granted two extensions of time to respond to the summary judgment motion. (Dkt. Nos. 65, 67). The deadline for plaintiff's response was December 21, 2007. (Dkt. No. 67). On February 27, 2008, this court received a mass of documents from the plaintiff. (Dkt. No. 68). Plaintiff has submitted more than 400 hundred pages in a completely disorganized fashion.[2] This court has considered the relevant documents in plaintiff's submission. For the following reasons, this court agrees with defendants and will recommend dismissal of

---

clearly, that claim will be dealt with in that case. Thus, this court will ***not*** consider the alleged assault of October 31, 2003.

[2] Plaintiff's submission consists of the following: (1) Plaintiff's statement of undisputed facts - 6 pages; (2) Plaintiff's memorandum of law in opposition to defendants' motion for summary judgment - 18 pages; (3) Defendants' Local Rule 7.1 statement in 9:02-CV-1252 - 5 pages ; (4) 3 pages of photographs of plaintiff - undated; (5) 11 pages of ambulatory health records from 2000 and 2001 ; (6) 11 pages of miscellaneous letters and affidavits regarding transfers, interviews with psychiatrists, retaliation, and medication: (7) 6 copies of Freedom of Information requests between June 2003 and October 2007; (8) 11 pages of affidavits (handwritten, yellow paper); (9) approximately 25 pages of miscellaneous health records and statements by plaintiff about eye examinations and his eyeglasses; (10) approximately 25 pages of FOIL requests and responses to FOIL requests concerning records about prescription eyeglasses; (11) 8 pages of medical services requests (pink paper); (12) 16 pages of copies of defendants' responses to interrogatories and requests for admissions; (13) approximately 60 pages of letters from plaintiff regarding FOIL requests and responses from DOCS officials to those requests during 2004 and 2005; (14) approximately 50 pages of letters and responses from New York State Police, New York State Appellate Division, Third Department, and New York State Correctional Services, all dated 2005, 2006, or 2007 regarding plaintiff's complaints about an Inspector General's investigation; (15) approximately 55 pages concerning correspondence from Prisoners' Rights Project of the Legal Aid Society, with case notes and copies of grievances regarding the law library and access to writing materials, and complaints about mail issues during the year 2007; (16) copy of Tier III hearing, dated August 8, 2003, 41 of 43 pages; (17) papers relative to a completely different civil action, entitled *Kevin Sheils vs. LT. Byno, et al.,* 9:02-CV-1252; (18) miscellaneous copies of papers in this action specifically statements from defendants and other corrections officers with respect to the incident of July 26, 2003; (19) plaintiff's Statement of Undisputed Facts, and plaintiff's Memorandum of Law.

the complaint.

## CONTENTIONS

Plaintiff alleges five causes of action. Plaintiff's first cause of action states that defendant Rocks was deliberately indifferent to plaintiff's serious medical needs when he confiscated plaintiff's prescription eyeglasses and made plaintiff wait 142 days for a replacement pair. Compl. ¶¶ 44-46.

Plaintiff's second cause of action alleges that defendants, Corrections Officers (CO) Matott, Mason, and John Doe[3] spit chewing tobacco on plaintiff and then assaulted him in violation of the Eighth Amendment. Compl. ¶¶ 47-49.

Plaintiff's third cause of action alleges that the same the three defendants (Matott, Mason, and John Doe) denied plaintiff immediate medical treatment in violation of the Eighth Amendment. Compl. ¶¶ 50-52.

Plaintiff's fourth cause of action alleges that defendants Rock, Matott, and John Doe retaliated against plaintiff for filing administrative complaints in violation of plaintiff's First Amendment right to redress of grievances. Compl. ¶¶ 53-55.

Plaintiff's fifth cause of action alleges that defendant Hearing Officer Curtis Drown was deliberately indifferent to plaintiff's serious medical needs by "forcing" plaintiff to wear someone else's prescription eyeglasses during a disciplinary hearing. Compl. ¶¶ 56-58.

---

[3]Plaintiff concedes that John Doe is "no longer a defendant."  (Plaintiff's Memo of Law, page IV).  Defendants state that John Doe was never served.  The docket sheet confirms this.

## DISCUSSION

1. **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990)(citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.*  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

2. **Facts**

As "background" information, plaintiff states that he suffers from "numerous psychiatric disorders" which he attributes to suffering a Grand Mal seizure during March of 2000, and to events following that Grand Mal seizure. Compl. ¶ 10. On July 26, 2003, plaintiff states that he was scheduled to visit with his fiancee, but was forced to wait in the visiting room for more than thirty five minutes.[4] Compl. ¶¶ 13-16. Plaintiff states that he saw other inmates entering the visiting room ahead of him.

---

[4]At his Tier III disciplinary hearing, plaintiff first stated that he waited for 35 minutes (T. 16), but then claimed he waited for one hour (T. 23).

4

Compl. ¶ 16.  Plaintiff alleges that when he inquired about the delay, he was told to shut his mouth by CO Roberts. *Id.*  As a result, plaintiff states that he became "anxious." *Id.*  Plaintiff then claims that Corrections Officers began calling plaintiff derogatory names in front of other inmates entering the visiting room. Compl. ¶ 19.

Plaintiff did not complete his visit, instead, plaintiff alleges that defendant Rock arrived in the area, and plaintiff states that he was "immediately" handcuffed, his eyeglasses were removed, he was taken to a "secluded" room and "enticed to fight with defendants Rock and Matott. Compl. ¶ 21.  Plaintiff claims that defendant Rock noticed that plaintiff was agitated and frightened, and escorted plaintiff back to his cell without explaining why plaintiff's visit had been denied and without giving plaintiff a receipt for the confiscated eyeglasses. Compl. ¶ 22.

Plaintiff asserts that later that afternoon, defendants Matott and Doe came to plaintiff's cell, and after spitting chewing tobacco in plaintiff's face and eyes, defendant Matott entered plaintiff's cell and assaulted plaintiff repeatedly with a "billy club." Compl. ¶ 23.  Plaintiff claims that he sustained large contusions on his head and wrist as a result of defendant Matott's actions. Compl. ¶ 24.  Plaintiff states that his requests for medical attention during the next 36 hours were ignored, and that he was told that his condition was "not an emergency." Compl. ¶ 25.  Plaintiff does not specify to whom these requests were directed. *Id*.

Plaintiff alleges that on July 27, 2003, he was issued a misbehavior report, signed by defendant Matott and CO Roberts.[5]  Plaintiff states that this was his first

---

[5] CO Roberts is not a defendant in this action.

"Tier III ever in approximately 17 years." Compl. ¶ 26.  It is unclear from the

complaint itself what the basis was for the misbehavior report.  It is clear from the

other documents of record that the misbehavior report was the result of plaintiff's

unruly conduct in the visiting are on July 26, 2003.  Plaintiff alleges that he filed

grievances and complaints to both facility personnel and with the Inspector General's

Office. Comp. ¶ 27.  Plaintiff claims that on "at least 43 separate occasions, plaintiff

filed grievances, complaints and letters in regard to his eyeglasses." Compl.   ¶ 32.

Plaintiff claims that on August 4, 7, and 8, 2003, during his disciplinary

hearing, defendant Drown "forced" plaintiff to wear someone else's eyeglasses.

Compl. ¶ 37.  Plaintiff claims that defendant Drown told plaintiff that if plaintiff did

not wear the glasses, defendant Drown would conduct the hearing anyway. *Id.*

Plaintiff claims that he told defendant Drown that the eyeglasses hurt his eyes and

apparently, plaintiff filed a grievance complaining about defendant Drown's conduct.

Compl. ¶ 37.  Plaintiff states that he was found guilty of the misbehavior, despite CO

Musseau's testimony on plaintiff's behalf. Compl. ¶ 42.  Plaintiff was sentenced to

ninety days in the Special Housing Unit (SHU).[6] *Id.*

Plaintiff states that as a result of the events of July 26, 2003, he "suffered

difficulties with his mental disorders," and his psychiatric medication had to be

increased. Compl. ¶ 28.  Plaintiff states that on July 28, 2003, he was taken to the

Mental Health Unit, and was prescribed an additional 20 milligrams of the medication

---

[6] The court notes that plaintiff was also sentenced to a loss of privileges and a five month
loss of good time. Fruchter Decl. Ex. E at pp.1-2.  The loss of good time was later reduced on
appeal to three months. *Id.*

Paxil, plus 100 milligrams of the medication Visteril.[7]

## 3.   **Medical Care (Eye Glasses)**

In order to state an Eighth Amendment claim based on constitutionally

inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate

indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The

first element is ***objective*** and measures the severity of the deprivation, while the

second element is ***subjective*** and ensures that the defendant acted with a sufficiently

culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d

698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has

a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9

(1992).  A medical condition has been considered "sufficiently serious" when there is

a "condition of urgency," one that may result in death, degeneration, or extreme pain.

*Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  The seriousness of a

plaintiff's medical need may also be determined by reference to the effect of denying

the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services*,

151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted).  Thus, if unnecessary and

wanton infliction of pain results from the denial of treatment, or if the denial of

treatment causes the inmate to suffer a lifelong handicap or permanent loss, the

---

[7]According to drugs.com, Visteril is an anti-anxiety medication.

condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element of the standard, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

In *Koehl, v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996), the Second Circuit held that the deprivation of prescription eyeglasses could rise to the level of and Eighth Amendment violation if plaintiff needed the eyeglasses, depending on the serious medical need for the glasses. In *Koehl*, the plaintiff claimed that he needed the glasses to avoid double vision and the loss of depth perception that resulted from a head injury. *Id.* The court reversed the grant of summary judgment in favor of defendants, stating that such visual deficiencies could cause a person to fall or walk into objects, adequately meeting the test of "suffering." *Id.* The court also found that it was "not beyond dispute that Koehl will be unable to develop evidence to show that both officers were aware of his serious medical need for the eye-glasses." *Id.*

In this case, plaintiff claims that Sergeant Rock confiscated plaintiff's eyeglasses on July 26, 2003, and that plaintiff's eyeglasses were not returned, causing him to suffer "double vision, migraine headaches, . . . great pain and emotional suffering." Compl. ¶ 45.  Plaintiff alleges that he was required to wait for "142 days for a new pair" causing harm to plaintiff's physical well-being. Compl. ¶ 44.

The records submitted by both defendant *and plaintiff* show that defendant Rock did confiscate plaintiff's glasses on July 26, 2003. Rock Aff. ¶ 6.  Sergeant Rock's affidavit specifically states that plaintiff's eyeglasses and identification card were taken from him during the July 26, 2003 incident in the visiting area, where plaintiff was boisterous, uncooperative, and threatening the staff. Rock Aff. ¶¶ 3-6. Sergeant Rock's affidavit further states that he and Corrections Officer Dubrey later escorted plaintiff back to plaintiff's cell. Rock Aff. ¶ 6.

CO J. Dubrey was given plaintiff's eyeglasses and identification card by Sergeant Rock on July 27, 2003, and CO Dubrey returned *both* items to Inmate Sheils in his cell the same day. Rock Aff. Exs. A & B.   There is a separate statement from Corrections Officer Dubrey stating that he received plaintiff's eyeglasses and identification card from Sergeant Rock and returned them to plaintiff on July 27, 2003. Rock Aff. Ex. B.  The statements attached to defendant Rock's affidavit are facility records from the investigation of one of plaintiff's grievances. Rock Aff. Ex. A.  Officer Duprey's statement that he returned the glasses on July 27, 2003 was written on August 2, 2003, shortly after the incident. Rock Aff. Ex. B.

Plaintiff alleges that defendant Rock "went on record" in response to one of

9

plaintiff's grievances, as saying that Rock was not working on July 26, 2006, while alleging in another grievance that plaintiff's glasses were returned to him on July 26, 2003. Compl. ¶¶ 30-31.  Plaintiff is attempting to imply that defendant Rock made inconsistent statements during the investigation of plaintiff's grievances.  However, defendant Rock explains that another Corrections Sergeant, *Raney* Rock, was mistakenly interviewed in response to one of plaintiff's grievances.[8]  Sergeant *Raney* Rock was *not* the Sergeant involved in plaintiff's incident on July 26, 2003, and may not have been working on July 26. Rock Aff. ¶ 10.

Sergeant *Robert* Rock, the defendant in this case, relates another version of the incident in front of the visiting room on July 26, 2003, and alleges that when he arrived at the visiting area, plaintiff was "uncooperative and continued to threaten and verbally harass staff." Rock Aff. ¶ 4.  Defendant Rock explains that plaintiff's eyeglasses were taken from him to avoid any injury to plaintiff or staff due to plaintiff's hostile behavior. Rock Aff. ¶ 7.

Plaintiff's own exhibits show that he wrote various letters almost immediately after the incident and wrote many complaints to many different individuals about his glasses.  Plaintiff wrote a letter to the Superintendent that was received in the Superintendent's office on July 28, 2003. Plaintiff's Ex. B at p.64.  Plaintiff wrote a letter to the Inspector General on the same day as the incident. *Id.* at 62.  Those initial

---

[8] Plaintiff's own exhibits support this assertion.  Plaintiff's Ex. B contains a note from Captain Minogue to Lieutenant Lacy, stating that "Rainey Rock" had gotten something by mistake, and it should have been "Bob Rock." *Id.* at p.12.  This note was dated September 2, 2003, and is entirely consistent with the claim that the wrong individual was interviewed regarding plaintiff's incident.

letters did not complain about the deprivation of his eyeglasses or comment that he could not see or write because he did not have his glasses.  Plaintiff had an appointment with a social worker on July 28, 2003.  Although plaintiff only submits part of the social worker's report, there is no indication that plaintiff complained about the deprivation of his glasses or the injurious effect that the deprivation allegedly had. Plaintiff's Ex. B at 69.  Plaintiff did write a statement on July 28, 2003, in which he described the visiting room incident and stated that defendant Rock took plaintiff's glasses and stated that plaintiff would never see them again. *Id.* at p.71-72.

Plaintiff did write a grievance, complaining, in part, about his eyeglasses.  This was the same grievance in which the incorrect "Rock" was interviewed. Plaintiff's Ex. D at 4-5.  The grievance was filed on August 7, 2003, and the Superintendent's response stated that plaintiff should "file a sick call slip to see the eye doctor." *Id.* at 7. On October 8, 2003, the Central Office Review Committee (CORC) responded to plaintiff's appeal, stating that plaintiff's identification card and eyeglasses were returned to him on July 27, 2003. *Id.* at 8.  The CORC also noted that "the grievant's request for replacement eye glasses is being processed.  The grievant's last eye examination was in November 2000, and if glasses are warranted, they will be provided in accordance with Department policy." *Id.*  Plaintiff's Ambulatory Health Record, dated July 29, 2003 indicates that he mentioned the deprivation of his eyeglasses to the medical department and was told that he needed to make out a claim. *Id.* at 9.

Interestingly enough, plaintiff wrote a claim on August 4, 2003, entitled "Claim

11

Form for BiFocal Eyeglasses that Sgt. R. Rock took from me on July 26, 2003."
Plaintiff's Ex. D at 10.  In that document, plaintiff complained that he could not read
the forms without his eyeglasses, and then asked if inmates were required to use the
forms and if there was a deadline "on filing for these eye glasses, a hot pot [and] other
items that *the porters stole from me when they moved my bags from D-4-17 to E-4-
20 on 7/29/03*." *Id.*  (emphasis added).  It appears that plaintiff was claiming that the
eyeglasses may have been taken by porters on July 29, 2003.

The court also notes that on August 29, 2003, Sergeant M. Devins wrote a
memorandum to Captain Minogue, stating that plaintiff's medical records were sent to
Albany for "approval for new glasses," but there was no answer as of August 29,
2003. *Id.* at 17.  Plaintiff had an "optometry" consultation on September 15, 2003, in
which the doctor stated that plaintiff was due for an eye examination and eye glasses,
*if* the optometrist deemed that new glasses were necessary. *Id.* at 18.  Plaintiff told the
consultant that he did not have glasses because they were taken by "security" and not
returned. *Id.*  Plaintiff appears to have had an eye examination on September 10, 2003.
*Id.* at 22.  Eye glasses were delivered to plaintiff on December 17, 2003. Plaintiff's
Ex. D at 11.

During the Tier III hearing which began on July 29 and ended on August 8,
2003, plaintiff complained to defendant Drown, the hearing officer, that plaintiff did
not have his eyeglasses, and the Hearing Officer read the charges line by line and
verified that plaintiff understood each of the charges. Fruchter Aff. Ex C at 1-10 & 9
(Hearing Transcript)(HT).  The hearing was adjourned so that plaintiff could review

documents. *Id*. at 9.  When they began the hearing again, defendant Drown noted that plaintiff still did not have his glasses, but plaintiff stated that he "just wanted to get it behind [him]." *Id.*  Later, plaintiff stated that he wished to adjourn the hearing until he could get his glasses. HT at 16.  The hearing officer then stated that he found a pair of somebody's glasses in a drawer, and gave those glasses to plaintiff. HT at 17.  Plaintiff stated that he was able to read the documents with another pair of eyeglasses. *Id*. at 17. Defendant Drown did not "force" plaintiff to use someone else's glasses.

Despite the fact that plaintiff was apparently able to proceed with those glasses for some time, he later withdrew his statement that he was able to utilize the substitute eyeglasses, and stated that he was ***unable*** to proceed. *Id*. at 28-31.  On another day, plaintiff utilized a different "substitute" pair of eyeglasses that enabled him to read documents.  *Id*. at 37.  Defendant Drown noticed that plaintiff was wearing a different pair of glasses. *Id.*  Defendant Drown stated that "I do see that you're wearing glasses today." *Id.*  Plaintiff responded that "[y]eah, these are a little bit stronger." *Id.*

The record of the hearing ***clearly shows*** that plaintiff was disruptive and attempting to manipulate the hearing by adopting inconsistent positions and claiming he was unable to continue without eyeglasses, when in fact, he was not required to read any documents but simply asked to propose questions to the witnesses.  *Id*. 14-40. The hearing transcript shows that the Hearing Officer ("H.O.") granted many of plaintiff's requests for witnesses, and allowed plaintiff great latitude in questioning the corrections officers.  (Transcript, 13-16; 17-22; 24-28).  Plaintiff insisted on interrupting the H.O., and was warned at least three times about his obstructive

13

behavior.  (Transcript, 16, 22, 30).  Plaintiff asked many questions about irrelevant issues (Transcript, 15, 19, 27, and 31), and was argumentative (T. 20, 22, 27-30).

Defendant Drown confirmed that plaintiff's mental condition did not preclude his active participation in the hearing. Defendants' Ex. D.  At the end of the hearing, plaintiff stated that "*I want to plead guilty to all the charges and put this behind me.*" (T. 38) (emphasis added).  Plaintiff then admitted that he was "so upset" that he "may have got [sic] a little out of hand . . . Because [of] my personality disorders" (T. 38) that it is "probably pretty safe to say" that he "flipped out" and went "wacko."  (T. 39). Plaintiff also specifically admitted that he was guilty of "Violent Conduct."[9]  (T. 39).

The records submitted by plaintiff show that plaintiff filed ***numerous grievances*** about obtaining new prescription eyeglasses, and did obtain new eyeglasses.  The record also shows that defendant Rock instructed CO Duprey to return plaintiff's glasses to him on July 27, 2003, and CO Duprey states that he returned the glasses.  The initial deprivation of the glasses was done for security purposes because, as plaintiff admitted during the disciplinary hearing, he went "wacko" in the visiting area.   If plaintiff's glasses were somehow lost after this incident, defendant Rock cannot be held liable for deliberate indifference.

Although this record appears to show that plaintiff waited approximately 140

---

[9] Plaintiff is not challenging the result of the disciplinary hearing and does not raise any due process claims in that regard.  He only claims that he was forced to wear someone else's glasses.  Plaintiff would not be able to raise claims that would necessarily invalidate the result of the hearing because plaintiff lost good time, and any such claims would be barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) and *Edwards v. Balisok*, 520 U.S. 641 (1997).  His Eighth Amendment claim may, however, proceed. *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999).

days for new prescription eyeglasses, the record is clear that defendant Rock was ***not***
responsible for this delay.  Plaintiff wrote many letters and complained to the medical
department about the glasses.  He had an eye examination in September and his
glasses were delivered in December.  Additionally, the record shows that ***after*** the
incident of July 26, 2003, plaintiff filed numerous grievances, numerous FOIL
requests, and that plaintiff wrote complaint letters to DOCS and other entities about
the July 26th incident.  Apparently, plaintiff had no difficulty preparing all of the FOIL
requests, grievances, letter complaints, and affidavits despite the fact that he did not
have his "new" prescription eyeglasses.

With respect to defendant Drown, there is absolutely no indication that he
"forced" plaintiff to proceed with someone else's eye glasses to plaintiff's medical
detriment.  In fact, as stated above, plaintiff arrived at the hearing wearing a different
pair of glasses than defendant Drown had provided.  Thus, there is no evidence that
defendant Drown was deliberately indifferent to plaintiff's serious medical needs.

## 4.   **Excessive Force**

The Eighth Amendment prohibits the "'unnecessary and wanton infliction of
pain.'" *Baker v. Willett*, 42 F. Supp. 2d 192, 196 (N.D.N.Y. 1999)(quoting *Estelle v.
Gamble*, 429 U.S. 97, 103 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).
When the use of excessive force is alleged, the court must determine whether the force
"was applied in a good faith effort to maintain or restore discipline or maliciously and
sadistically for the very purpose of causing harm." *Whitely v. Albers*, 475 U.S. 312,
320-21 (1986)(quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*,

414 U.S. 1033 (1973)).  In order to meet the constitutional standard for excessive

force, the defendants' conduct must be "'inconsistent with the contemporary standards

of decency' and 'repugnant to the conscience of mankind.'"*Whitely*, 475 U.S. at 327.

There is an objective and a subjective prong to the Eighth Amendment analysis.

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The objective prong is satisfied when

plaintiff shows that the deprivation was "sufficiently serious," and the subjective

prong is satisfied by showing that defendants had a "wanton state of mind." *Griffin v.*

*Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).  Minor uses of physical force do not reach

the constitutional level as long as the force used is not "repugnant to the conscience of

mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  However, the court must

determine the need for the force, the relationship between the need and the amount of

force used, the extent of the injury suffered, the extent of the threat to the safety of

staff and inmates, and any efforts made to temper the severity of a forceful response.

*Whitely*, 475 U.S. at 321.

In this case, plaintiff alleges that on the afternoon of July 26, 2003, after the

visiting room incident, defendants Matott, Mason, and John Doe came to plaintiff's

cell, that defendant Matott spit chewing tobacco into plaintiff's eyes and face, and that

defendant Matott used his baton to hit plaintiff on the head and wrist resulting in

contusions.  Defendants argue that plaintiff alleges no more than a de minimis force,

and that the "absence of injuries" establishes as a matter of law that the use of force

was de minimis. Defendants' Mem. of Law at 12.

It has been held, however, that a malicious use of force to cause harm may

constitute an Eighth Amendment violation "whether or not significant injury is evident." *Griffin v. Crippen*, 193 F.3d at 91.  In *Griffin*, the plaintiff alleged that the guards had beaten him while he was handcuffed. *Id.* at 90-91.  The only injuries he suffered were a bruised shin and swelling over his left knee. *Id.*  The Second Circuit stated that even though the excessive force claim was "weak" and the evidence "extremely thin," summary dismissal was not appropriate because there were still genuine issues of material fact concerning what transpired after the inmate was handcuffed and whether the defendants had used "malicious force" against him. *Id.* at 91.

In this case, plaintiff was examined three days after the incident, and the only "injury" was a bruise to his right wrist.  Although plaintiff claimed to have a bump on his head, no bump was found, and no medical treatment was administered.  This court finds that the medical records do ***not*** support the plaintiff's claim that he received "very large contusions on his head and wrist." Compl. ¶ 24.  The fact that defendants may have spit tobacco on plaintiff, although vulgar and inappropriate, would not rise to the level of a constitutional violation.

Plaintiff alleges that defendant Matott entered his cell and "maliciously, sadistically, and unlawfully" assaulted plaintiff "repeatedly with his billy club." Compl. ¶ 23.  If this had been the case, the medical records would have shown more than a bruise on plaintiff's right wrist.  Thus, this court finds as a matter of law, that the force alleged by plaintiff was de minimis, and summary judgment is appropriate on

plaintiff's excessive force claim.[10]

## 5.   **Medical Care (After Alleged Assault)**

Plaintiff third claim asserts that defendants Matott and Mason denied plaintiff immediate medical treatment, and as a result, plaintiff sustained serious personal injuries.  It is unclear, however from the complaint who plaintiff asked for medical treatment. Compl. ¶ 25.  Plaintiff alleges that he was assaulted by defendants Matott and John Doe, and then "on at least five occasions during the next 36 hours plaintiff requested medical attention for his eyes and contusions." *Id.*  In plaintiff's "cause of action," he appears to blame defendants Matott and Doe. Compl. ¶ 50.

A review of the records submitted by defendants, including the affidavit of Brian Lecuyer,[11] shows that plaintiff was examined on July 29, 2003 complaining about a bruise on plaintiff's wrist and a lump on plaintiff's head. Lecuyer Aff. ¶ 3. During the examination, the only thing noted was a bruise to plaintiff's right wrist. There were no contusions or lumps on plaintiff's head.  The Ambulatory Health Record dated July 29, 2003 specifically states that no lump was noted on plaintiff's head on that date. Lecuyer Aff. Ex. A.  The ambulatory health record also notes plaintiff's complaint about his eyeglasses, and plaintiff was instructed to file a claim

---

[10] As stated above, this complaint alleges an additional incident, in which plaintiff claims to have been seriously injured after excessive force was used on him by corrections officers. Plaintiff does not name any of those officers in this case, and he has filed a separate federal claim regarding that alleged assault.  Plaintiff also does not add that allegation to his causes of action. Thus, this court has not considered that separate claim of excessive force.

[11] Brian Lecuyer is the Nurse Administrator at Clinton Correctional Facility. Lecuyer Aff. ¶ 1.

regarding his eyeglasses. *Id.*

This court notes that although plaintiff has asserted that Defendants Matott and Mason denied plaintiff's request for medical care, there is nothing in the record to indicate that these two defendants were responsible for any of plaintiff's medical care. The record clearly shows that plaintiff did visit the medical department at Clinton Correctional Facility on July 29, 2003 and was examined.  The notation shows that plaintiff's condition was ***not*** an emergency, and in fact, his injury was a "bruise" on the wrist.  No treatment was administered. Lecuyer Aff. Ex. A. This court finds therefore that plaintiff's claim that he was denied medical care by Defendants Matott and Mason is without merit, and the court recommends dismissal of this claim.

## 6.   <u>Retaliation</u>

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534

U.S. 506 (2002)).

In this case, plaintiff claims that Defendants Rock and Matott intimidated and harassed plaintiff in retaliation for plaintiff's filing of administrative complaints. Plaintiff does **not** give any details about how these defendants would have known about any complaints that were filed, and plaintiff does not provide any proof of any administrative complaints filed **prior to the July 26, 2003 incident**.  Plaintiff **does submit** a massive amount of documentation showing many grievances and complaints to DOCS officials, New York State Police, and other entities, but all of these complaints were dated **after the July 26, 2003 incident**.  The court finds, therefore, that Defendants Rock and Matott did not retaliate against plaintiff for the filing of administrative complaints since the record does not show that any administrative complaints were filed **before** the incident of July 26, 2003.  This court recommends dismissal of this claim.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**
*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72.

Dated: March 11, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge